IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JACQUELYN C. RHEUBOTTOM,          )
                                  )
        Plaintiff,                )
                                  )
            vs.                   )     Civil Action No. 06-496
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social Security,  )
                                  )
        Defendant.                )

**MEMORANDUM OPINION**

**I.   INTRODUCTION**

Pending before the Court are cross-motions for summary
judgment filed by Plaintiff Jacquelyn C. Rheubottom and Defendant
Michael J. Astrue, Commissioner of Social Security.[1]   Plaintiff
seeks review of final decisions by the Commissioner denying her
claims for disability insurance benefits ("DIB") under Title II of
the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and supplemental
security income benefits ("SSI") under Title XVI of the Social
Security Act, 42 U.S.C. §§ 1381 *et seq.*[2]   For the reasons discussed

---

[1]   Pursuant to Fed. R. Civ. P. 23(d)(1), Michael J. Astrue, who
became Commissioner of Social Security on February 12, 2007, is
substituted for Jo Anne B. Barnhart in this action; *see also* 42 U.S.C.
§ 405(g) ("Any action instituted in accordance with this subsection
shall survive notwithstanding any change in the person occupying the
office of Commissioner of Social Security or any vacancy in such
office.")

[2]   A person is eligible for supplemental security income benefits
if she is "disabled" (as that term is defined elsewhere in the
regulations) and her income and financial resources are below a

1

below, Plaintiff's motion is denied and Defendant's motion is granted.

## II.  **BACKGROUND**

### A.   Factual Background

In the fifteen years prior to her first application for DIB and SSI, Jacquelyn Rheubottom had worked intermittently as a salesperson in a department store, waitress, bartender, cashier in a fast food establishment, and census taker.  (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 7, "Tr.," at 111.)  On June 25, 2000, Ms. Rheubottom fainted at church and was taken by ambulance to a hospital emergency room in Uniontown, Pennsylvania.  Because she reported to physicians there that she had been unconscious for 10 to 20 minutes, she was kept in the hospital for three days and underwent extensive testing to try to ascertain the cause of her fainting episode.  All the test results were unremarkable.  (*See* Tr. 190-203.)

A month later, Ms. Rheubottom was again seen at the Uniontown Hospital after she experienced chest pain.  She underwent another battery of tests, all of which were essentially normal except that

---

certain level.  42 U.S.C. § 1382(a).  To be granted a period of disability and receive disability insurance benefits, a claimant must show that she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which she was last insured.  42 U.S.C. § 423(a).  Administrative Law Judge Moon concluded, and the parties do not dispute, that Ms. Rheubottom was required to show that she became disabled no later than September 30, 2005.  (Tr. 25.)

2

she complained of dizziness at her peak aerobic capacity during a stress test. (See Tr. 183-190; 326-334.)

Ms. Rheubottom began treating with Dr. Nicolas Pavouris, a general practitioner, in July 2000. After hearing her symptoms, Dr. Pavouris recommended that she consult with Dr. Richard F. Debo, an ear, nose and throat specialist. Dr. Debo noted that her syncope had been resolved although she was now complaining of headaches. All other test results were normal, including a neurological exam. (Tr. 248-253.)

Ms. Rheubottom then consulted with Dr. Christopher Bonnet, who agreed with Dr. Debo's diagnosis and offered the opinion that Plaintiff had a vasovagal[3] variant of syncope, for which he prescribed an increase dosage of beta blocker which she was taking for borderline hypertension. Despite these symptoms, a tilt table test performed on December 22, 2000, was negative. (Tr. 254-260.)

From late 2000 through November 2005, Ms. Rheubottom continued to treat with multiple physicians for her fainting episodes which were variously described as occurring once or twice a week to once or twice a month and, at other times, as resolved. (Tr. 264; 229; 526-530.) She was examined by a cardiologist in April 2003, who reported no cardiac abnormalities and who was unable to shed any

---

[3] "Vasovagal" refers to vascular conditions which implicate the vagus nerve which supplies autonomic sensory and motor fibers chiefly to the viscera. See the on-line medical dictionary provided by the National Institutes of Health at www.nlm.nih.gov/medlineplus, last visited May 21, 2007.

light on the cause of Plaintiff's syncope. (Tr. 510-514.) She
also began complaining of headache pain behind the eyes and of
migraine headaches, glaucoma, mild fatigue and mild arthralgias.
Because she reportedly had positive ANA testing and an elevated ESR
(Tr. 223), she was evaluated by Dr. David Seaman on March 22, 2001,
for possible systemic lupus erythematosus.[4] Following a series of
examinations and tests, Dr. Seaman concluded that she demonstrated
none of the symptoms of lupus but did believe she should be
examined for possible fibromyalgia.

In connection with her initial fainting episode, Ms.
Rheubottom had been examined by Dr. Shobha Asthana, a neurologist.
Dr. Asthana prescribed a variety of drugs to try to relieve
Plaintiff's migraine headaches which purportedly occurred every two
or three days and lasted for as long as four days. (Tr. 491, 494;
261-266; 491-509; 666-673.) Plaintiff reported to Dr. Asthana in
May 2005 that she had experienced no fainting spells since November

---

[4]   Systemic lupus erythematosus (lupus) is an autoimmune disease,
leading to chronic inflammation. The underlying cause of autoimmune
diseases is not fully known. Symptoms vary from person to person, and
may be intermittent; almost all lupus patients have joint pain and
most develop arthritis, most frequently in the fingers, hands, wrists,
and knees. One of the diagnostic tools for lupus is antinuclear
antibody ("ANA") testing used to determine the number of antibodies
produced by the immune system which attack the body's own tissues
instead of foreign toxins. Usually, there is no detectable ANA in the
blood, but people without any specific disease may have low levels of
ANA for no apparent reason. The erythrocyte sedimentation rate test
("ESR") is a nonspecific screening test for various diseases, e.g.,
tuberculosis, tissue necrosis, rheumatologic disorders, or otherwise
unsuspected diseases in which symptoms are vague or physical findings
are minimal. *See* medical dictionary at www.nlm.nih.gov/medlineplus.

4

2004. (Tr. 667.) Ms. Rheubottom also continued to treat with Dr. Pavouris for her migraines; at various times, he prescribed Depakote, Darvocet and Topomax.[5] (Tr. 288-290; 544; 550.)

Following a single episode of eye pain and photophobia in December 2000, she was diagnosed with possible glaucoma or an attack of glaucoma while sleeping.[6] While her eyes were examined every six months as a precaution, no treatment for glaucoma (e.g., medication or surgery) was needed as late as May 29, 2003, when her prognosis was described as "excellent." (Tr. 179-181; 267-275; 552-558.)

In April 2003, Ms. Rheubottom underwent a colonoscopy which determined that she was suffering from sigmoid diverticulosis, but without inflammatory bowel disease or polyps. (Tr. 518-525.) A month later, Plaintiff was treated in a hospital emergency room for vomiting and diarrhea and was diagnosed with gastroenteritis and possible early diverticulitis. (Tr. 515-516.)

In August 2003, Plaintiff began treatment with ACS

---

[5] Depakote (valproic acid) is used alone or with other medications to treat certain types of seizures, bipolar disorder, and to prevent migraine headaches, but not to relieve headaches that have already begun. Darvocet (propoxyphene) is used to relieve mild to moderate pain. Topomax (topiramate) is an anticonvulsant used with other medications to treat certain types of seizures in patients with epilepsy or other seizure disorders. *See* medical dictionary at www.nlm.nih.gov/medlineplus.

[6] Ms. Rheubottom later described this episode to Dr. Seaman as "a 3-day episode of complete visual loss" (Tr. 276) and also reported it similarly to Dr. Lee (Tr. 638), but the Court can find no evidence in the medical record to support this description.

5

Psychological Associates, Inc., seeking help for depression and pain associated with her many impairments. (Tr. 573-574; 586-588; 674-715.) Plaintiff reported to her psychiatrist, Dr. Leyla Somen, in June 2004 that she was no longer depressed. (Tr. 587.) Concurrently with her psychological counseling, Ms. Rheubottom also underwent a number of objective tests at the Jefferson Pain and Rehabilitation Center. The tests conducted by Dr. John K-S Lee in February and March 2004 revealed minor cervical nerve root irritation, but otherwise no abnormalities. However, Dr. Lee increased her prescription for Neurontin (which Plaintiff later discontinued on her own) and prescribed Vicodin.[7] (Tr. 631-632.) By December 2004, she reported that her treatment (acupuncture, home exercises, therapy, and injections) had been beneficial and that her pain was negligible. She voluntarily discontinued treatment at the Pain Center in June 2005. (Tr. 622-655.)

When Plaintiff began experiencing pain in her lumbar and cervical spine along with numbness in her arms and legs in June 2004, Dr. Janice Allen performed a number of diagnostic tests, none of which revealed any abnormalities other than mild degenerative disc disease at the C5-6 level. As late as May 2005, Plaintiff's disc disease remained relatively mild. (Tr. 596-621.)

---

[7] Neurontin (gabapentin) is an anti-convulsant used to help control certain types of seizures in patients who have epilepsy and to relieve the pain following an attack of shingles, and treating other types of seizures. Vicodin (aceteminophen and hydrocodone) is used to relieve mild to moderate pain. *See* medical dictionary at www.nlm.nih.gov/medlineplus.

6

Ms. Rheubottom did not return to work at any time following her initial fainting spell on June 25, 2000.

B. Procedural Background

On March 6, 2001, Ms. Rheubottom filed applications for disability insurance benefits and supplemental security income benefits, claiming disability due to "multiple meds," glaucoma, and lupus. (Tr. 87-96; 338-340.) After the applications were denied, a hearing was held on February 5, 2002, before the Honorable Randall W. Moon, Administrative Law Judge ("ALJ"), at which Ms. Rheubottom appeared *pro se.* (Tr. 731-782.) Judge Moon also denied benefits in a decision dated May 22, 2002. (Tr. 348-364.) Ms. Rheubottom's appeal to the Social Security Appeals Council was denied on March 14, 2003 (Tr. 365-366), and apparently not appealed to the district court.

Ms. Rheubottom filed a second set of applications on May 12, 2003, claiming disability due to fibromyalgia, migraine headaches, syncope, and diverticulosis, which was also initially denied. (Tr. 407-410; 727-730.) Her request for review by an ALJ was granted and a hearing held on January 8, 2004, again before Judge Moon; this time, Plaintiff was represented by counsel. (Tr. 783-833.) Following appeal of Judge Moon's May 27, 2004 decision denying benefits (Tr. 367-379), the Appeals Council remanded the case for further consideration, including review of additional medical evidence and a more complete explanation of the ALJ's findings in

7

his decision to be issued following another hearing.[8]  (Tr. 381-383.)

Following the third hearing, held on July 26, 2005, Judge Moon denied benefits again in an opinion issued on November 28, 2005. (Tr. 22-36.)  The Appeals Council declined to review the ALJ's decision on February 24, 2006, finding no error of law or abuse of discretion and concluding the decision was based on substantial evidence to support the ALJ's findings.  (Tr. 4-6.)  The November 28, 2005 opinion therefore became the final decision of the Commissioner for purposes of review.  42 U.S.C. § 405(h); Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), citing Sims v. Apfel, 530 U.S. 103, 107 (2000).  Plaintiff filed suit in this Court on April 13, 2006, seeking judicial review of the ALJ's decision.

---

[8]  Specifically, the Appeals Council found that in arriving at his decision that Plaintiff's allegations regarding her limitations were not totally credible, the ALJ had failed to consider non-medical factors relevant to evaluation of the intensity, persistence, and limiting effects of her symptoms such as her past work record, side effects of medication, and record of treatment.  Second, the ALJ's hypothetical question to the vocational expert did not take into account his previous finding that Ms. Rheubottom was "moderately" limited in the domain of concentration, persistence or pace as described in Listing 12.00C(3).  The ALJ was directed to update the evidence of Plaintiff's medical condition; further evaluate her subjective complaints and provide a rationale for his conclusions regarding her allegations; reconsider her maximum RFC during the entire period in question and explain his findings on that subject, including the weight given to medical evidence; and provide an opportunity for Plaintiff to address any additional evidence of record at a second hearing.  (Order of Appeals Council dated April 8, 2005, Tr. 381-383.)

8

## C.  Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C. § 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the plaintiff resides.

## III.  STANDARD OF REVIEW

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999).  Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson, id. at 401.  "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence."  Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake de novo review of the decision

9

and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), *citing* Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), *citing* Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV. **LEGAL ANALYSIS**

### A.   The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income or disability insurance benefits, the burden is on the claimant to show that she has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[9] currently existing in the national economy. The impairment must be one which is expected to result in death or

---

[9]   According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities. . . . Work may be substantial even if it is done on a part-time basis." "Gainful work activity" is the kind of work activity usually done for pay or profit.

10

to have lasted or be expected to last for not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000).

To determine a claimant's rights to either SSI or DIB,[10] the ALJ conducts a formal five-step evaluation:

(1)  if the claimant is working or doing substantial gainful activity, she cannot be considered disabled;

(2)  if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, she is not disabled;

(3)  if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4)  if the claimant retains sufficient residual functional capacity ("RFC")[11] to perform her past relevant work, she is not disabled; and

(5)  if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, she is not disabled.

20 C.F.R. § 416.920(a)(4); see also Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to

---

[10]  The same test is used to determine disability for purposes of receiving either type of Social Security benefits. Burns v. Barnhart, 312 F.3d 113, 119, n1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both SSI and DIB applications.

[11]  Briefly stated, residual functional capacity is the most a claimant can do despite her recognized limitations. Social Security Ruling 96-9 defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule."

11

present evidence to support his position that she is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[12] Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Moon first concluded that Ms. Rheubottom had not engaged in substantial gainful activity since her amended onset date of May 23, 2002,[13] inasmuch as there was no evidence to show that she had worked after her initial fainting episode on June 25, 2000. (Tr. 25.) Resolving step two in Plaintiff's favor, the ALJ found that she suffered from degenerative disc disease of the cervical spine, diverticulosis, migraine headaches, fibromyalgia, and mood disorder, all of which were "severe" as that term is defined by the Social Security Administration.[14] He also noted that although Ms. Rheubottom had

---

[12] Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n2, *citing* Bowen v. Yuckert, 482 U.S. 137, 146-147 n5 (1987).

[13] Because Ms. Rheubottom had previously been found not disabled at any time through May 22, 2002, the date of the ALJ's decision regarding her first application for DIB and SSI, the onset date was amended to the next day following that decision.

[14] *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's "physical ability to do basic work activities," i.e., "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," as compared to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience. Yuckert, 482 U.S. at 149-151. The

12

asserted a history of "fainting spells," there was no objective medical evidence in the record to establish an etiology for these alleged episodes. (Tr. 25.)

At step three, the ALJ concluded that Plaintiff's conditions did not satisfy any of the criteria in Listing 1.00 (musculosketal system), 5.00 (digestive system), 11.00 (neurological system), 12.00 (mental disorders), or 14.00 (immune system). (Tr. 26.) He specifically compared Plaintiff's medical evidence regarding her mood disorder to the criteria of Listing 12.04 (affective disorders), and determined that she had no more than mild to intermittently moderate limitation in her activities. (Id.) He then exhaustively reviewed Ms. Rheubottom's work history and medical records (Tr. 26-34) before concluding, at step four, that Ms. Rheubottom's residual functional capacity was insufficient for her to return to her previous work as a bartender, bar manager, cashier, waitress or sales associate, all of which the vocational expert ("VE") at the hearing, Mr. James E. Ganoe, had described as medium to light semi-skilled work. (Tr. 34; 883-885.)

In response to the ALJ's first hypothetical question, Mr. Ganoe stated there were numerous unskilled light[15] jobs such as mail

---

claimant has the burden of showing that the impairment is severe. Id. at 146, n5.

[15] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of

13

clerk, price marker, and parking garage attendant which Plaintiff could perform, even with the restrictions incorporated in the ALJ's question. At the unskilled sedentary[16] level, the VE stated that Plaintiff could work as a general production inspector, general sorter, or surveillance monitor. (Tr. 885-888.) Based on Plaintiff's status as a younger individual[17] with a high school education, the ability to communicate in English, a work history of semi-skilled occupations with no transferable skills, the medical evidence of record, and the testimony of the VE, the ALJ determined at step five that Ms. Rheubottom was not disabled and, consequently, not entitled to benefits. (Tr. 34-35.)

Plaintiff argues that the ALJ's determination was not based on substantial evidence for two reasons. First, the ALJ erred as a matter of law by relying on the lack of objective evidence of

_____

arm or leg controls. To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities." 20 C.F.R. §§ 404.1567(b) and 416.967(b). A person who is able to do light work is also assumed to be able to do sedentary work unless there are limiting factors such as loss of fine dexterity or the inability to sit for long periods of time. Id.

[16] The term "sedentary" describes work which requires lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Jobs are sedentary even if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567. A sedentary job should require no more than approximately 2 hours of standing or walking per eight-hour work day, and sitting should typically amount to six hours per eight-hour work day. Social Security Ruling 83-10.

[17] Plaintiff was 40 years old at the time of the hearing, making her a "younger" person according to Social Security regulations. 20 C.F.R. § 404.1563(c) and § 416.963(c).

14

fibromyalgia as a basis to deny her claim and by relying on lay medical opinion, so-called "inconsistencies," and irrelevant facts to determine that her testimony was not credible. (Plaintiff's Brief in Support of Motion for Summary Judgment, Docket No. 12, "Plf.'s Brief," at 7-14.)  Second, the decision was based on an inaccurate hypothetical question which failed to accurately set forth all of her specific work-related limitations as documented in the record. (Id. at 15-17.)  We address each of those arguments in turn.

## B.    Errors in the ALJ's Credibility Determination

Since Plaintiff raises no arguments regarding the ALJ's conclusions concerning the severity of her other reported conditions - glaucoma, lupus, depression, migraine headaches, diverticulosis, and degenerative disc disease - nor about the effect of those impairments on her ability to perform substantive gainful employment, we consider only the issue of her fibromyalgia diagnosis[18] and the ALJ's credibility determination.

_____

[18]  According to the Merck Health Encyclopedia, fibromyalgia is a common chronic problem characterized by body-wide pain in joints, muscles, tendons, and other soft tissues.  It has been linked to fatigue, morning stiffness, sleep problems, headaches, numbness in hands and feet, depression, and anxiety; it can develop along with other musculoskeletal conditions such as rheumatoid arthritis or lupus.  The actual cause of the disorder is unknown and there is no proven prevention or cure.  The overwhelming characteristic of fibromyalgia is defined tender points  which occur symmetrically at 18 points on the back of the neck, shoulders, chest, lower back, buttocks, thighs, elbows, and knees.  The pain is commonly described as deep-aching, radiating, gnawing, shooting or burning, and ranges from mild to severe.  Although the pain associated with fibromyalgia is similar to that which occurs with arthritis, there is no

The ALJ noted that Plaintiff's "seemingly valid fibromyalgia diagnosis" was first reported in October 2001 at a one-time consultative physical examination conducted in connection with her initial disability application.[19] (Tr. 27.) At that time, Dr. Noah Bass reported positive tender point reactions at 15 of the 18 points associated with fibromyalgia. (Tr. 280.) When considered along with her reported sleep disturbances and fatigue, Dr. Bass concluded that Ms. Rheubottom "does indeed meet American College of Rheumatology criteria for a diagnosis of fibromyalgia." (Tr. 281.)

We need not consider in detail the rest of the medical evidence regarding Plaintiff's diagnosis because, as Ms. Rheubottom ultimately concedes, the ALJ agreed that she had been diagnosed with the disease. (See Plf.'s Brief at 10.) Unlike other diseases and conditions for which the severity and limiting aspects can be

---

significant swelling, destruction, and deformity of joints in fibromyalgia as there is in diseases such as rheumatoid arthritis. A diagnosis of fibromyalgia requires a history of a least three months of widespread pain, and pain responses in at least 11 of 18 tender point sites. Laboratory, x-rays and other tests are chiefly used to rule out other conditions that may have similar symptoms. See health encyclopedia at www.mercksource.com., last visited May 21, 2007.

[19]   The Court notes that on January 10, 2001, Dr. Pavouris indicated that Plaintiff reported "mild fatigue as well as mild arthralgias throughout all of her joints." (Tr. 294.) On March 21, 2001, he further noted a report of pain on the left side of her neck and in her back following a long walk. (Tr. 292.) In May 2001, Plaintiff reported that her muscle aches and pains had improved considerably since she had started taking Piroxicam. (Tr. 291.) Six months later, at her regular follow up appointment with Dr. Pavouris on August 28, 2001, Plaintiff reported that she was "having a lot of pain in her back from her fibromyalgia" (Tr. 290), but the Court can find no report for the period January through September 2001 in which any physician actually diagnosed her with this condition.

16

objectively tested, however, determination of the residual functional capacity of a claimant suffering from fibromyalgia depends largely on the claimant's own reports of the pain, fatigue, and other subjective symptoms associated with the disease. Sarchet v. Chater, 78 F.3d 305, 306 (7ᵗʰ Cir. 1996) (Posner, C.J.) This determination consequently depends on the ALJ's perception of the claimant's credibility, another conclusion in the ALJ's decision with which Plaintiff agrees. (Tr. 27; see also Plf.'s Brief at 10, describing the credibility analysis as "in many ways outcome-determinative.") Ms. Rheubottom's argument is, however, that the ALJ erred as a matter of law because his credibility determination "relies almost exclusively on [lay] medical analysis, irrelevant (or at least, seemingly irrelevant) observations and several dubious basis [sic] for finding that Plaintiff's allegations are not credible." (Plf.'s Brief at 10.[20])

Social Security Ruling[21] ("SSR") 96-7p, "Evaluation of Symptoms

---

[20] Plaintiff also argues in passing that the ALJ erred by "deprecating the gravity of [her] fibromyalgia due to the lack of objectively discernable symptoms." (Plf.'s Brief at 7.) However, she fails to identify the point in the ALJ's decision - and the Court has been unable to find it on her behalf - where the ALJ required such objective evidence. In fact, Judge Moon explicitly stated that fibromyalgia "is not amenable to conclusive, objective determination, and any related diagnosis is necessarily predicated upon the subjective complaints and responses of an examinee." (Tr. 27.)

[21] "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228 F.3d at 271, citing 20 C.F.R. § 402.35(b)(1). "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are

17

in Disability Claims: Assessing the Credibility of an Individual's Statements," and 20 C.F.R. § 404.1529(c)(3) explicitly set out seven factors an ALJ must consider when a claimant's subjective symptoms suggest a greater severity of impairment than can be shown by objective medical evidence alone. Those factors include (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors which precipitate or aggravate the symptoms; (4) the type, dosage and effectiveness of medication taken to alleviate the symptoms and the side effects thereof; (5) treatments other than medication used to alleviate the symptoms; (6) any other measures used to relieve the symptoms; and (7) other factors concerning functional limitations or limitations due to pain or other symptoms.

The Court recognizes that the weight given to a claimant's subjective allegations of pain depends on the ALJ's view of the claimant's credibility. This determination by an ALJ is entitled to great deference by the district court. Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003). The determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the

---

basically the same." Sykes, id., quoting Heckler v. Edwards, 465 U.S. 870, 873 n3 (1984).

18

reasons for that weight." Schwartz v. Halter, 134 F. Supp.2d 640, 654 (E.D. Pa. 2001), quoting SSR 96-7p. Where medical records indicate that a claimant has complained about pain to his treating physicians who are unable to explain its etiology, "an ALJ has a duty to consider a Plaintiff's subjective complaints of pain and to probe further." Reefer, 326 F.3d at 380-81. This Court must review the factual findings underlying the ALJ's credibility determination to ensure that it is "closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005) (internal quotation omitted). However, because the ALJ is best able to judge a witness's truthfulness, this Court will reject an ALJ's credibility determination only if it is "patently wrong." Schmidt v. Barnhart, 395 F.3d 737, 746-47 (7th Cir. 2005); see also Horodenski v. Comm'r of Soc. Sec., No. 06-1813, 2007 U.S. App. LEXIS 2874, *15 (3d Cir. Feb. 7, 2007) ("where. . . the ALJ has articulated reasons supporting a credibility determination, that determination will be entitled to 'great deference.'")

In assessing Plaintiff's subjective complaints, the ALJ concluded that her "statements concerning the intensity, duration and limiting effects of such symptoms are not entirely credible." (Tr. 26.) He then went on to analyze in detail:

- The medical evidence of record, concluding that it "remains inadequate to support the claimant's subjective, longstanding contention of total disability," e.g., lack of any objective evidence to support her claims of

19

chronic syncope. (Tr. 26, 29.)

- The fact that "all of her impairment-related complaints to medical practitioners and others since 2000 have been offered within a context that has involved her underlying financial and other interests in establishing or maintaining eligibility for state welfare assistance and Social Security disability benefits."[22] (Tr. 27, referring to Tr. 221-223.)

- Plaintiff's long-term use of potentially addictive narcotic pain medications.[22] (Tr. 27.)

- Plaintiff's repeated reliance on speculative or tentative diagnoses rendered in response to her subjective complaints, but which were subsequently refuted by objective medical tests, e.g., her initial claim of disability due to lupus and/or glaucoma. (Tr. 27, 30.)

- Inconsistencies regarding her lack of a driver's license and her doctors' limitation on her driving.[22] (Tr. 27-28.)

- Plaintiff's erratic work history predating any allegations of debilitating impairments and her reliance for many years on public assistance. (Tr. 27-30.)

- Her statement to her psychiatrist, Dr. Somen, in June 2004 that she would go back to work if her disability application were again denied, as compared to Plaintiff's denial at the July 2005 hearing that she had made such a statement. (Tr. 28, see also Tr. 588.)

- Inconsistent statements which "somewhat exaggerated her impairment-related limitations" (Tr. 28-29), e.g.,
  denial of any previous syncope immediately after the first documented episode on June 25, 2000, only to report a month later that she had a "one-year history of syncope" with the "most recent episode on June 23" and four such previous episodes in the prior year (compare Tr. 195, 302, and 511)[23]; and

---

[22] Because Plaintiff explicitly cites these points, they are discussed in more detail below.

[23] Although not mentioned by the ALJ, the denial of syncopal episodes prior to June 2000 is also inconsistent with a third report on December 22, 2000, that "spells have occurred [for about] 15 years"

20

reports to Dr. Pavouris on January 10, 2001, and to Dr. Asthana on January 26, 2001 that she had been diagnosed with glaucoma whereas her actual diagnosis by an ophthalmologist was only of "questionable" glaucoma (*compare* Tr. 294 and 504 to Tr. 273 and 552).

- Plaintiff's lack of motivation to return to work in the five years following her first syncopal episode. (Tr. 28.)

- The "progressive" and "dramatic" escalation in her impairments since 2000 to include lupus, depression, fibromyalgia, glaucoma, migraine headaches and degenerative disc disease, most of which were mentioned only as possible diagnoses or described as "mild" or moderate impairments. (Tr. 28-29.)

- A "premature" application for disability benefits only eight months after her diagnoses of possible lupus, glaucoma, and/or negative side effects from her "multiple meds," none of which was supported by objective evidence.[22] (Tr. 30.)

- Plaintiff's inconsistent reports that her syncopal episodes began one year prior to June 25, 2000, yet she continued to work as a sales associate seven days a week, six hours per day from October 1999 to June 2000. (Tr. 31, *see also* Tr. 89.)

- Plaintiff's report to Dr. Somen in June 2004 that she had stopped working because of migraine headaches and symptoms of fibromyalgia, contradicting both her disability claim filed in March 2001 stating she was unable to work because of glaucoma, lupus and "multiple meds," and her report to Dr. Lee in February 2004 that she had stopped working because of "fainting spells." (Tr. 31, *compare* Tr. 587 and 638.)

- Plaintiff's contradictory reports about her use of alcohol.[22] (Tr. 31.)

- Activities of daily living which are inconsistent with disabling pain, e.g., "cleaning for community service," packing and unpacking household belongings after changing

(Tr. 255), and another on September 24, 2002, that she had experienced syncope starting when she was a teenager (Tr. 511.)

21

residences, serving as maid of honor at her cousin's wedding, attending church regularly, etc. (Tr. 32-33.)

• Multiple notes by therapists and other mental health providers that Plaintiff expressed "manipulative" and "very somatic" thought processes, a "sense of entitlement," and frustration with doctors who were not "helping" her. (Tr. 33.)

In short, the ALJ set forth at least sixteen different reasons why he found Ms. Rheubottom's allegations of debilitating pain not entirely credible. We address the five specific issues which Plaintiff argues were improperly relied upon by the ALJ in his credibility analysis.

Plaintiff describes the ALJ's unexplained observation that Ms. Rheubottom did not have a driver's license as "bizarre on its face." (Plf.'s Brief at 13; see also multiple references to this point at Tr. 28-31.) We agree with Plaintiff that the ALJ, perhaps unnecessarily, over-emphasized the fact her doctors told her not to drive after her first fainting episode even though, in reality, Ms. Rheubottom never had a driver's license. It is not clear if the doctors were aware of the fact that she did not have a license or were simply giving a standard precaution as they would for anyone who had unexplained syncope.[24] That does not mean that the

_____

[24] A note by a consulting neurologist in June 2000 states "Patient has been advised to driving restrictions [sic] until she remains event free for 6 months as recommended by State law." (Tr. 196.) Dr. Bonnet stated in December 2000 that, "Ms. Rheubottom has not been driving and will continue not to drive until cleared by us once we have her symptoms under control." (Tr. 260.) There is no recognition in either instance that the physician knew Plaintiff did not have a driver's license.

22

ALJ's comprehensive credibility determination was erroneous, however, since this was only one of numerous inconsistencies noted in his decision.

Plaintiff next argues that her statement to an emergency room physician on June 25, 2000, that she did not consume alcohol is not necessarily inconsistent with her report to Dr. Somen in June 2004, that "years before" she used to drink. (Plf.'s Brief at 12, *see also* Tr. 31, 587, 192.) The ALJ did not ask Ms. Rheubottom to explain these possibly inconsistent statements at the hearing and, according to Plaintiff, the two statements may be easily reconciled. That is, it could be true that in June 2000, Ms. Rheubottom had not had a history of alcohol consumption but began using alcohol thereafter and in June 2004 could truthfully report that "years before" (e.g., in 2001-2003), she had used alcohol but had not done so more recently. (Plf.'s Brief at 11.) This analysis would be more persuasive if she had not also reported on March 2, 2003, and May 25, 2003, to doctors at the Uniontown Hospital that she was a "nondrinker." (Tr. 515; 526.) The Court finds no error in the ALJ's reference to, and partial reliance on, this inconsistency in ascertaining Plaintiff's credibility.

Plaintiff next argues the ALJ used the fact that she had filed previous applications for DIB and SSI to improperly undermine her credibility. Instead, he "chose, without warning, or without bothering to give the Plaintiff an opportunity to explain, to jump

23

to the most unfavorable interpretation." In a related argument, she contends that the ALJ's reference to the "constant presence of multiple sources of secondary gain/motivation" which undermines her credibility is not supported by the law or evidence. (Plf.'s Brief at 13-14.)

The ALJ referred to the earlier applications in the context of what he regarded as a "premature" benefits application, i.e., one filed only three to six months after tentative diagnoses of lupus and glaucoma, both of which were subsequently rejected. As the ALJ properly noted, at that time, Ms. Rheubottom had no objective medical evidence that these conditions would last twelve months or end in death. He also noted in the same paragraph his opinion that Mrs. Rheubottom "demonstrated a significant commitment to the notion that she would remain incapable of performing any and all forms of work activity." (Tr. 30.) He later concluded that "the claimant has somewhat committed herself to the disability process" and her subjective complaints "have clearly escalated in conjunction with her pursuit of related and contingent financial benefits." (Tr. 33-34.)

In short, we read this portion of the ALJ's decision not to criticize the fact that Ms. Rheubottom had filed previous applications for DIB and SSI, but rather the fact that she evinced no interest in attempting to work any time after her June 2000 fainting episode. The "premature" applications and the escalation

24

in subjective complaints are both directly contradictory to Plantiff's statement to Dr. Somen in June 2004 that she would return to work if the Social Security Administration denied her applications for a third time. When the observation about the timing of the first applications is considered together with Plaintiff's erratic work history prior to June 2000 and repeated evidence of symptom exaggeration and/or misreporting, all of which are well-documented in the record, we conclude that the ALJ did not err by referring to Plaintiff's previous application for benefits or by concluding that a desire for secondary gain played a role in forming her subjective complaints.

Finally, Plaintiff argues that the ALJ further indulged his lay, unsupported medical opinion by stating:

The undersigned observes that, although long-term treatment of fibromyalgia with highly addictive narcotics is generally contraindicated by standard medical practice, the claimant has relied upon darvocet and more recently, the stronger narcotic Vicodin for her alleged subjective pain symptoms.

(Tr. 31.)

Plaintiff argues that the ALJ never explained the basis for this observation. In light of the fact that these drugs were prescribed by her physicians, the ALJ's lay medical observation about "standard medical practice" is not only incorrect, it is an improper basis for discounting her credibility. (Plf.'s Brief at 11.)

Again, were this comment one of a few, or the only, reason

given by the ALJ for questioning Ms. Rheubottom's credibility, the Court would be inclined to reject his decision. But it is one of numerous reasons, most of which are thoroughly discussed and accurately based on the medical evidence of record and Plaintiff's own statements. We agree that an ALJ must not succumb to the temptation to "play doctor" by attempting to substitute his own medical opinions for those of a claimant's physician. *See* Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001). While this statement may have reflected overreaching by the ALJ, particularly because he cites no medical treatise or other support for his observation, we do not find it reversible error.

In sum, the ALJ here provided the necessary "specific, cogent reasons for the disbelief" and supported his credibility finding with accurate references to the evidentiary record. *See* Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995). "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p at 5. Taken together, the numerous inconsistencies and exaggerations in Plaintiff's reports to her physicians, psychiatrists, and the Social Security Administration, as well as in her testimony at the three hearings, provide substantial evidence to support the ALJ's credibility finding. Even if we were to conclude, however, that the ALJ erred by referring to Plaintiff's driving history and her use or abuse of prescription

26

pain medication, there would still be more than sufficient evidence to support his conclusions. *See* Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005) (case would not be remanded despite ALJ's erroneous analysis of claimant's obesity because proper consideration would not have changed the outcome). Where substantial evidence exists in the record to support the credibility determination, the ALJ need only accord limited weight to the claimant's subjective symptoms when determining her residual functional capacity at step four. Scatorchia v. Comm'r of Soc. Sec., No. 04-3626, 2005 U.S. App. LEXIS 11488, *10 (3d Cir. June 15, 2005). Therefore, we conclude that the ALJ did not err in his credibility determination or, consequently, in his analysis of Plaintiff's residual functional capacity.

C.   Errors in the ALJ's Hypothetical Question

We need not consider this portion of Plaintiff's argument at any length. Plaintiff's sole contention here is that the decision to deny benefits was not supported by substantial evidence inasmuch as the hypothetical questions posed by the ALJ to the vocational expert failed to accurately set forth all of her specific work-related limitations of function as documented in the administrative record. (Plf.'s Brief at 15, *citing* Burns v. Barnhart, *supra*, and Podedworney v. Harris, 745 F.2d 210(3d Cir. 1984).) However, she fails to state exactly which work-related limitations were omitted, arguing only that the erroneous

27

evaluation of her credibility led in turn to inaccurate
hypothetical questions. Because we have concluded that the ALJ's
credibility determination was not deficient, this argument must
necessarily fail.

Plaintiff's motion for summary judgment in her favor is
denied. An appropriate order follows.

May _24_, 2007                        _William L. Standish_
                                       William L. Standish
                                       United States District Judge

cc: Counsel of Record

28